ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-40010-01-JAR |
| | ) | |
| JOSE ISRAEL CHAVIRA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND MOTION FOR DISCOVERY OF DRUG DETECTION DOG INFORMATION

This matter is before the Court on defendant's Motion to Suppress (Doc. 18), and Motion for Discovery of Drug Detection Dog Information and Suggestions in Support Thereof (Doc. 19). On April 20, 2005, the Court held a hearing and took both motions under advisement. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule. Because the Court finds that Chavira's detention was lawful, his consent to search was voluntary, and because the drug detection dog was reliable enough to provide probable cause to further search defendant's vehicle, the Court will not suppress the evidence discovered by Trooper Craig Phillips subsequent to the traffic stop. Additionally, the Court denies defendant's motion for discovery beyond the training and certification records the Government has already produced for the drug dog at issue.

## I.  Factual Background

At about 12:30 a.m. on February 14, 2005, Trooper Phillips effected a traffic stop of a pickup

truck that was traveling eastbound on Interstate-70, in Shawnee County Kansas.   Trooper Phillips stopped the truck after observing the truck weaving out of its lane of travel twice.   Defendant Chavira was driving the truck.   During initial contact with Chavira, Trooper Phillips noticed a cell phone on the driver's side visor and an air freshener hanging on the gear shift.   Trooper Phillips also noticed a black duffel bag on the passenger side of the truck and a can of Red Bull energy drink on the floor.   Chavira indicated that he was tired and that he was looking for a place to rest.   Trooper Phillips asked for Chavira's driver's license, and instructed him to step out of the vehicle and meet him at the patrol car. When Chavira handed him his driver's license, the trooper noticed that he was "shaky" and that his voice was "quivery."

During this time, Trooper Phillips spoke to Chavira at the passenger side of his patrol car. Trooper Phillips asked Chavira questions about the weather and his travel plans.   Chavira advised that he was driving from Denver to St. Louis to visit a cousin for one week.   He also told Trooper Phillips that he worked as a carpet installer in Denver with a partner who was working while Chavira was out of town.

Next, after requesting Chavira's registration and insurance, Trooper Phillips returned to Chavira's vehicle to compare the vehicle identification number (VIN) on the registration to the VIN on the dashboard and on the doorjamb.   Trooper Phillips did not ask for Chavira's permission to inspect the VIN number on the doorjamb before opening the door to conduct this inspection.   While inspecting the VIN on the doorjamb, he noticed a second cell phone on the driver's side floorboard.   Trooper Phillips then returned to the patrol car and handed Chavira his license, insurance, and registration. Trooper Phillips also gave Chavira a warning citation for failing to maintain a single lane of traffic, and

2

explained this violation to him.  Trooper Phillips testified that during the seven minutes it took him to write the warning ticket, he observed that Chavira's hands were shaking.  At some point during the traffic stop, Trooper Phillips' Lieutenant, Lt. Brinker, arrived but remained in his patrol car for most of the stop.

At this point, Chavira and Trooper Phillips were still standing at the patrol car, with Chavira standing closer to his truck than Trooper Phillips, who was separated from Chavira by the opened passenger door of his patrol car.  After returning Chavira's documentation, Trooper Phillips engaged him in another brief conversation about travel plans.  Chavira told the trooper that he had never been to St. Louis, that his cousin did not know he was coming, and that he did not know his cousin's address.  Then, Trooper Phillips asked if Chavira had anything illegal in the vehicle and he replied, "no."  Trooper Phillips then asked a series of questions about whether there were certain drugs or firearms in the vehicle.  According to Trooper Phillips, Chavira shook his head profusely (indicating a negative response) and looked away when he asked about cocaine.

Trooper Phillips then asked, "OK if I search your car?" and Chavira verbally granted him permission to search.  Trooper Phillips asked a second time if "it would be OK," and Chavira agreed.  Lt. Brinker stood with Chavira during the search.  The Trooper searched for about twenty minutes, finding: (1) in the glove compartment, a lime that had an "x" shaped cut carved in the peel of the lime; (2) fuel stains on the gas tank; (3) fuel spillage on the inside of the truck bed where the fuel tube filter had been removed; and (4) fresh scratches around the bolts that fasten the truck bed to the frame of the truck.  Trooper Phillips then asked Chavira if he could take the vehicle to the Highway Patrol garage to further search.  Chavira replied, "I think you already looked enough."  Trooper Phillips then contacted

3

dispatch and requested a drug detection dog be brought to the scene.

Almost one hour later, Trooper Scott Morris arrived with "Ike," a drug detection dog. Trooper Phillips explained to Trooper Morris his suspicion that the gas tank had been tampered with. Trooper Morris first checked for hazards around the vehicle and then walked the dog around the truck in a counterclockwise direction, beginning at the right rear of the vehicle. The dog alerted and indicated at the passenger side of the vehicle, on the right corner of the cab, along the door seam. Trooper Morris ceased the counterclockwise rotation at this point and led the dog directly to the driver's side of the car, near the left-rear tire. The dog did not indicate at this location. Chavira was placed in handcuffs and transported to the Highway Patrol garage for further searching. A further search of the vehicle's fuel tank yielded eight brick-shaped packages wrapped in plastic, weighing approximately ten pounds. It later tested positive as cocaine.

## II.  Motion to Suppress

### A.  *Unreasonable Detention*

A routine traffic stop is similar to an investigative detention, so it is analyzed under the principles set forth in *Terry v. Ohio*.[1] Chavira was initially stopped for crossing the center line. Chavira does not contest the validity of the initial stop; however, he argues that after giving him the warning citation, Trooper Phillips' improperly prolonged the detention by asking additional questions. Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry v. Ohio*.[2]

---

[1]  392 U.S. 1, 20 (1968).

[2]  *Id.*.

"Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'"[3]  It must be temporary, and its scope must be carefully tailored to its underlying justification.[4] An officer may lengthen the detention for questioning or investigation unrelated to the reason for the initial stop: (1) where the detention has become consensual; or (2) if not consensual, where the officer has "'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring' in order to justify detaining an individual for a period of time longer than that necessary to review a driver's license and vehicle registration, run a computer check, determine that the driver is authorized to operate the vehicle, and issue the detainee a citation."[5]

### 1. Consent

Retention of a motorist's driver's license and/or other pertinent documents by the officer during any questioning renders an encounter not consensual, until such time as the documents are returned.[6] The Tenth Circuit has consistently held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."[7]  In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if

---

[3] *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)).

[4] *United States v. Gutierrez-Daniez,* 131 F.3d 939, 942 (10th Cir. 1997), *cert. denied,* 523 U.S. 1035 (1998); *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997).

[5] *U.S. v. Salzano,* 158 F.3d 1107, 1111 (10th Cir. 1998) (quoting *U.S. v. Gonzalez-Lerma,* 14 F.3d 1479, 1483 (10th Cir. 1994)); *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998).

[6] *See Hunnicut,* 135 F.3d at 1349; *United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991), *cert. denied* 502 U.S. 1093 (1992).

[7] *United States v. Gonzalez-Lerma,* 14 F.3d 1479, 1483 (10th Cir. 1994), *cert. denied,* 511 U.S. 1095(1994); *accord United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir. 1995).

any bright-line rules."[8]  Rather, the court must consider "the totality of the circumstances in a particular case."[9]  While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, it "is not always sufficient to demonstrate that an encounter becomes consensual."[10]

Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'"[11]  The Tenth Circuit has observed in dicta that an officer leaning on a car may support a finding of a coercive show of authority.[12]  However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[13]  Merely failing to inform a driver that he is free to leave, does not necessarily render the encounter not consensual.[14]

When Trooper Phillips returned the papers and gave the warning to Chavira, the subsequent questioning must have been of a consensual nature to be justified.  Chavira claims that Trooper Phillips'

---

[8]  *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997).

[9]  *Id.* at 814 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

[10]  *Id.*; *see also United States v. Gregory,* 79 F.3d 973, 979 (10th Cir. 1996).

[11]  *Elliott*, 107 F.3d at 814.

[12]  *Id.*

[13]  *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993).

[14]  *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *Elliott*, 107 F.3d at 814.

demeanor and tone would not have allowed a reasonable person to believe that he was free to leave. He cites the fact that Trooper Phillips did not "break" his conversation with Chavira after returning his documents, and that he insinuated Chavira had broken the law.

But there is no evidence of any of the traditional factors indicating that a reasonable person would not feel free to leave.   Although more than one officer was present, Lt. Brinker was still in his patrol car; Lt. Brinker did not get out of his patrol car until Trooper Phillips began the vehicle search. There is no evidence that Trooper Phillips touched Chavira, or made reference to his weapon. Moreover, Chavira was closer to his truck than Trooper Phillips was; there was nothing impeding Chavira's path back to his vehicle.  The Court finds that under the totality of the circumstances, a reasonable person would have felt free to leave after Trooper Phillips issued the warning citation. Because the encounter subsequent to the warning was consensual, it was lawful under *Terry v. Ohio*.

## 2. Reasonable Suspicion

The Government contends, in the alternative, that Trooper Phillips had an objectively reasonable suspicion of criminal activity after he issued the warning citation, based on: (1) Chavira's hand was shaking when he handed the trooper his paperwork; (2) Chavira's vague travel plans; (3) Chavira's occupation; (4) Chavira was traveling by himself and it appeared he was trying to make the drive without stopping; (5) there were two cell phones in the vehicle; (6) there was an air freshener hanging from the gear shift;  and (7) Interstate 70 is a common route to transport drugs, based on the officer's training and experience.

**Nervousness**.  "When a motorist detained for a routine traffic violation, such as speeding, shows unusual signs of nervousness, this may be considered as part of the totality of circumstances a

reasonable law enforcement officer would analyze in investigating possible crimes."[15]   However, nervousness alone is not sufficient to form the basis of reasonable suspicion, since nervousness is a natural reaction to confrontation with the police.[16]   Therefore, nervousness, unless extraordinary and prolonged, may not weigh significantly in the assessment of reasonable suspicion.[17]

**Travel Plans.**   The mere fact that Trooper Phillips asked Chavira about his travel plans is not improper.   It is well-settled that questions about the motorist's travel plans during a traffic stop are reasonably related in scope to the purpose of the stop.[18]   However, confusion about the details of travel plans is "often an indication that a story is being fabricated on the spot."[19]   The Tenth Circuit has qualified this by explaining that vague answers about travel plans, alone, should not be accorded independent weight.   However, along with other factors, it may contribute toward an officer's formation of reasonable suspicion.[20]

**Cell Phones**.   Chavira supplemented his motion after the hearing with authority that Trooper Phillips' act of checking the VIN on the doorjamb without Chavira's consent was unlawful.   Chavira maintains that any evidence discovered through this unlawful entry into the vehicle should be suppressed as "fruit" of an unlawful search.   The Court finds that the only information gleaned from Trooper

---

[15]   *United States v. Santos*, __F.3d __, No. 03-8059, 2005 WL 768771, at *6 (10th Cir. Apr. 6, 2005).

[16]   *Id.*

[17]   *Id.* (citing *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001)).

[18]   *United States v. Holt*, 264 F.3d 1215, 1220-21 (10th Cir. 2001); *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[19]   *Santos*, 2005 WL 768771, at *10.

[20]   *Id.*

Phillips' examination of the VIN on the car door was the second cell phone on the floor of the car. Under *United States v. Caro*,[21] Trooper Phillips impermissibly extended the scope of Chavira's detention by entering his truck to check a secondary VIN against the VIN listed on the registration. The VIN on the dashboard matched the VIN on the registration, and Trooper Phillips did not indicate that the VIN on the dashboard appeared tampered with.  To be clear, this act did not negate any reasonable suspicion that Trooper Phillips may have held to continue to detain and question Chavira.[22] However, the only evidence that should be disregarded is the second cell phone Trooper Phillips noticed while looking for the VIN inside the car door.  The Court will disregard the second cell phone as a basis for reasonable suspicion to further detain and question Chavira.

Regardless of whether either nervousness, one cell phone, or vague travel plans, alone, may form a basis for reasonable suspicion, this Court must determine whether the factors cited by Trooper Phillips as a whole give rise to a reasonable suspicion of criminal activity.  In this way, the officers can draw from their own experience and training to "make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"[23]  In addition to nervousness and vague travel plans, Trooper Phillips noticed the cell phone, the air freshener, and the fact that he was traveling on Interstate 70.  He also found suspicious that Chavira, who claimed to be a

---

[21]   248 F.3d 1240 (10th Cir. 2001) ("where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention by entering a vehicle's passenger compartment for the purpose of further examining any VIN.")

[22]   *Id.* at 1246-47 (explaining the distinction between detaining to develop further justification for a search, and a search based only on reasonable suspicion).

[23]   *Santos*, 2005 WL 768771, at *10.

self employed contractor, could leave his business to travel for an entire week.  Taken together, these factors provided enough suspicion of drug trafficking to continue questioning.  The lawful scope of this stop was not exceeded by Trooper Phillips' additional questions.  Therefore, the Court determines that the scope of the traffic stop was reasonably extended because it was a consensual encounter.  In the alternative, Trooper Phillips developed a reasonable suspicion of drug trafficking without relying on his discovery of a  second cell phone while examining the secondary VIN.

### B.  Voluntariness of Consent to Search

Chavira claims that he did not consent to a search of his vehicle.  The Tenth Circuit has repeatedly held that "a person may voluntarily consent to a vehicle search despite being detained although the government still bears the burden of proving voluntariness."[24]  The voluntariness of a search is a question of fact to be determined by the "totality of the circumstances."[25]  The government must meet two standards: "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove that this consent was given without implied or express duress or coercion.'"[26]  Other factors relevant in determining the voluntariness of consent include the number of officers present, physical mistreatment, use of violence or threats, promises or inducements, deception or trickery, and physical and mental condition and capacity of the defendant

---

[24]  *See United States v. Wilson*, No. 03-3118, 2004 WL 928270, n.3 (10th Cir. Apr. 30, 2004) (collecting cases).

[25]  *Ohio v. Robinette*, 519 U.S. 33, 40 (1996).

[26]  *United States v. Hernandez*, 944 F. Supp. 847, 851 (D. Kan. 1996) (quoting *United States v. McRae*, 81 F. 3d 1528, 1537 (10th Cir. 1996)).

within the totality of the circumstances.[27] A final relevant factor is "the extent and level of the

defendant's cooperation with the police."[28]

Chavira contends that there was "no time to respond to [the trooper's] rapid-fire delivery" of

questions.  He also asserts that his consent was "reluctant" and "equivocal" in the face of two requests to

search the vehicle.  Finally, he states that "there was implied coercion present in the trooper's method."

Aside from the speed at which Trooper Phillips asked for consent, there is no evidence of any duress or

coercion.  There is no evidence that Chavira did not understand what he was being asked.  He did not

ask for clarification.  There is also no evidence of physical mistreatment, use of violence, threats,

promises, deception, or mental or physical incapacity.  There is no indication that Lt. Brinker showed

any sign of authority over Chavira until after Trooper Phillips acquired his verbal consent.  Under the

totality of the circumstances, the Court finds that Chavira voluntarily consented to the search of his car.

In addition, the Fourth Amendment violation by Trooper Phillips when he examined the VIN on

the doorjamb did not taint Chavira's subsequent consent to search.  When a search is preceded by a

Fourth Amendment violation, the government bears the burden of showing that the taint from that

violation was purged by an attenuation between the illegal detention and the consent.[29]  Under the

Supreme Court decision in *Brown v. Illinois*,[30] the Court should consider the totality of the

---

[27]  *See United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir. 1998) (quoting *United States v. McCurdy,* 40
F.3d 1111, 1119 (10th Cir.1994)), *cert. denied,* 525 U.S. 903 (1998).

[28]  *United States v. Tompkins,* 130 F.3d 117, 121 (5th Cir.1997), *cert. denied,* 523 U.S. 1036 (1998).

[29]  *Caro*, 248 F.3d at 1247.

[30]  422 U.S. 590, 603-04 (1975).

circumstances, paying close attention to the following factors: (1) the temporal proximity of the illegal detention and the consent; (2) any intervening circumstances; and (3) the purpose and flagrancy of any official misconduct.[31]   Here, although only a few minutes passed between the violation and the request for consent, for the reasons already described, there was a sufficient "break" in the encounter when Trooper Phillips returned Chavira's documentation.  In *Caro*, consent to search was given while the officer was still in possession of the driver's license and registration.[32]   Furthermore, Trooper Phillips' conduct was not particularly deliberate or flagrant, and he admitted that he checked the doorjamb despite the fact that the dashboard VIN did not appear suspicious.  Considering the attenuation between the illegal search and the consent, the Court finds that Chavira's consent to search the vehicle purged any further "taint" caused by Trooper Phillips inspecting the doorjamb of the vehicle without permission.

### C.  Withdrawal of Consent

"The general rule is that 'where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle.'"[33]   Chavira argues that after about twenty minutes of searching, he objected to the search and therefore withdrew any previous consent.  Specifically, when Trooper Phillips asked if he could move the truck to a police garage for more searching, Chavira refused.  At that point, Trooper Phillips called dispatch for a drug detection dog to be brought to the scene.

---

[31]   *Id.*; *Brown*, 422 U.S. at 603-04.

[32]   *Caro*, 248 F.3d at 1247.

[33]   *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) (quoting *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995)).

The Government does not contest that consent to search was effectively withdrawn by Chavira. Instead, it argues that Trooper Phillips had developed reasonable suspicion, and potentially probable cause, that Chavira was transporting drugs.  Trooper Phillips stopped searching the vehicle after Chavira withdrew his consent and waited for the drug dog to arrive.  At that point, Trooper Phillips believed that he had probable cause to continue to search; however, he requested the drug detection dog "just to be safe."  Chavira does not contest the fact that Trooper Phillips stopped searching the vehicle when he told him to stop.

Approximately one hour passed between the withdrawal of consent and the arrival of the drug dog.  The Government contends that Trooper Phillips discovered other items during his search that led to reasonable suspicion or probable cause justifying further detaining Chavira until the drug dog arrived. Trooper Phillips had discovered a lime in the glove box; and suspected that the "x" shaped cut in the lime peel served as a means to mask the odor of drugs.  Based on his training and experience, Trooper Phillips had also discovered reasons to suspect that the gas tank had been tampered with, based on his finding: (1) fuel stains on the gas tank; (2) fuel spillage on the inside of the bed where the fuel tube filter had been removed;  and (3) fresh scratches around the bolts that fasten the truck bed to the frame of the truck.

It is lawful to detain for the purposes of a canine sniff if the officer has a reasonable suspicion that the suspect is transporting drugs.[34]  "If the facts gleaned during the stop amount to reasonable suspicion of drug trafficking, additional delay to obtain a drug dog to sniff the vehicle may be justified.  The Tenth Circuit has held that an extended detention of almost forty minutes spent waiting for a drug-sniffing dog

---

[34] *United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002).

did not violate the Fourth Amendment."[35]

It is undisputed that consent was validly withdrawn after about twenty minutes of searching by Trooper Phillips.  But, by the time Chavira revoked consent, Trooper Phillips had a reasonable suspicion that Chavira was transporting drugs.[36]   At that point, based on this reasonable suspicion, Trooper Phillips was justified in detaining Chavira  until the drug dog arrived.  And, the drug dog's indication and alert, supplied probable cause justifying Trooper Phillips subsequent search of the truck.

Furthermore, the Court finds that Trooper Phillips did not detain Chavira for an unreasonable period of time between the withdrawal of consent and the arrival of Trooper Morris and Ike.  Trooper Phillips sought out Trooper Morris and the dog late at night–approximately 1:15 a.m.  Because Trooper Morris resides about twenty-five miles from the location of the traffic stop, it took some time for him to arrive.[37]  In fact, Trooper Phillips explained at the hearing that he felt that he called for the drug dog out of an abundance of caution, despite the fact that he believed he already had probable cause to further detain Chavira.  The Court finds that Trooper Phillips was diligent in procuring the dog as soon as possible under all of the circumstances.[38]

---

[35]   *United States v. Garcia*, 52 F. Supp. 2d 1239, 1246-47 (D. Kan. 1999) (citing *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997), *cert. denied*, 522 U.S. 926 (1997)).

[36]   *Id.* at 1271 (finding fifteen-minute detention to wait for drug-detection dog reasonable in view of officer's reasonable suspicion based on nervousness, rental agreement discrepancy, and presence of a short-range radio in vehicle); *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997), *cert. denied*, 522 U.S. 926 (1997) (43 minutes); *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (thirty minutes); *Garcia*, 52 F. Supp. 2d at 1252 (40 minutes).

[37]   *Id.* at 1151 n.1.

[38]   *United States v. Kopp*, 45 F.3d 1450, 1454 n.1 (describing diligence as pursuing a means of investigation that will quickly confirm or dispel an officer's suspicions).

### D.  Reliability of Canine Sniff

Chavira suggests that the indication by the drug dog, Ike, may not have provided probable cause to search the vehicle because Ike was not reliable.  Probable cause means that "there is a fair probability that contraband or evidence will be found in a particular place."[39] A dog alert is generally at least as reliable as many other sources of probable cause and "is certainly reliable enough to create a fair probability that there is contraband [present]."[40]  However, probable cause requires that the alert be made by a trained dog.[41]  The Tenth Circuit has explained that:

> With a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill.  When the annual certification process involves actual field testing and grading of the canine's drug-detection skills, the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine's skill and performance.[42]

For instance, a dog alert might not provide probable cause to search if the dog has a poor accuracy record.[43]  Such a showing could also be made if the dog's training was substandard, if the dog's health was in question, or if the circumstances of the search caused the Court to question the dog's reliability.[44]

Here, the evidence demonstrates that Ike was reliable.  Trooper Morris's testimony was

---

[39]  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[40]  *Unites States v. Ludwig*, 10 F.3d 1523, 1527-28 (10th Cir. 1993).

[41]  *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997), *cert. denied*, 525 U.S. 863 (1998).

[42]  *Id.* (quoting *United States v. Wood*, 915 F. Supp. 1126, 1136 n.2 (D. Kan. 1996), *rev'd on other grounds*, 106 F.3d 942 (10th Cir. 1997)).

[43]  *Ludwig*, 10 F.3d at 1528.

[44]  *Id.*

15

sufficient to establish that Ike was properly trained and certified; and there is no indication that Ike's

health was an issue.  Trooper Morris testified that Ike was certified and trained at the time of the stop.

Specifically, Trooper Morris recounted that he and Ike attended a ten-week training course beginning in

November 2004 to become certified.  The Government also submitted evidence of Ike's certification

dated January 6, 2005.  The dog is  required to be certified annually.  Trooper Morris testified that Ike is

trained on drug detection one day every week and the Government submitted training records for Ike

covering the period between November 2004 and March 2005.  Prior to February 14, 2005, Ike had

been in the field on four to six occasions, according to Morris.  Trooper Morris testified that he only

remembered one occasion when Ike  indicated but no drugs were found.  In that case, the suspect

admitted to smoking marijuana in the vehicle prior to the search; thus Ike's indication was not inaccurate

or false, for Ike is trained to respond to the odor of drugs.

Because Ike is certified and trained, the Court finds that a presumption of reliability applies.

Chavira is unable to rebut this presumption, as there is no evidence in the record to suggest that "a more

complete examination of the canine's skill and performance" is necessary. Chavira points to the following

facts to suggest that a deeper examination of Ike's reliability is in order: (1) the short length of time that

Ike sniffed the car before indicating, (2) the fact that Trooper Morris directed Ike to the gas tank area

after being told by Trooper Phillips that he suspected drugs were located there, (3) Ike's failure to

indicate next to the gas tank, and (4) Ike's past false alert.  The Court finds that none of these facts

suggest the need for a greater examination into Ike's reliability.  First, the length of time used to conduct

the dog sniff is not indicative of unreliability.  Trooper Morris testified that he conducted the sniff

according to protocol by first examining the vehicle for hazards, and then leading Ike around the vehicle

16

in a counterclockwise direction beginning at the right-rear of the vehicle.  Chavira provides no reason why a handler would continue to lead a drug detection dog around a location after the dog has indicated.  The fact that Ike indicated at the vehicle provided the only probable cause necessary to further search the vehicle.  Second, Morris did not "lead" Ike to any area of the vehicle until after the dog alerted and indicated on the passenger side.  Trooper Morris explained that the truck was parked on the shoulder of the interstate facing east and that the wind was blowing from the north.  Because the drug dog detects odors, it easily could have alerted to the drugs from the passenger side, as this would have been downwind from the location of the drugs on the driver's side.  There is no evidence in the record of a false alert to a drug odor by Ike.  Again, the dog successfully detected the odor of marijuana in the case recounted by Trooper Morris in his testimony.  Thus, the Court concludes that Ike's indication provided probable cause to search the vehicle.

### III.  Motion for Discovery of Drug Detection Dog Information

Chavira asks the Court to order the Government to produce sixteen different types of documents concerning the training, care, and certification of Ike.  The Government has already produced the certification and training records relevant to Ike; however, Chavira suggested at the suppression hearing that the Government should be required to produce the rest of the requested documentation, including the Police Service Dog Reports to reveal Ike's "real-work experience."

Absent some additional showing of materiality, the Government need not produce any further information than the certification and training records for Ike.[45]  As discussed above, the Court does not believe that the circumstances of the search indicate that the dog's alert or indication was unreliable.

---

[45]  *See United States v. Lambert*, 351 F. Supp. 2d 1154, 1162 (D. Kan. 2004).

17

Therefore, the Court will deny the remainder of this motion, as the Government has properly responded by providing Chavira with the appropriate training and certification records relevant to Ike.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress (Doc. 18) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT** that defendant's Motion for Discovery of Drug Dog Information (Doc. 19) is **GRANTED IN PART AND DENIED IN PART.** The Government shall provide defendant with any information concerning training and certification of Ike. The remainder of the motion is denied.

IT IS SO ORDERED.

Dated this 12th day of May 2005.

S/ Julie A. Robinson
Julie A. Robinson
United States District Judge